UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------- X
LORI JO VINCENT, RUTH ANN : 
GUTIERREZ, LINDA U. GARRIDO, and : 
JOHN GARRIDO, on behalf of themselves and : 
all others similarly situated, : 
 : No. 03 CV 2876 (JGK)
                Plaintiffs, : 
 : **MOSS CODILIS' LOCAL**
  - against - : **CIVIL RULE 56.1 STATEMENT**
 : **OF MATERIAL FACTS**
THE MONEY STORE, TMS MORTGAGE, : 
INC., HOMEQ SERVICING CORP., and : 
MOSS, CODILIS, STAWIARSKI, MORRIS, : 
SCHNEIDER & PRIOR, LLP, : 
 : 
                Defendants. : 
---------------------------------------------------------------------------- X

      1.      In April 1997, TMS Mortgage, Inc. ("TMS"), a mortgage loan servicing company, retained Moss, Codilis, Stawiarski, Morris, Schneider & Prior, LLP ("Moss Codilis") to enforce TMS' rights under the mortgages it serviced.  Moss Codilis agreed to perform services for TMS related to the creation, development, and operation of a program to send delinquent borrowers default notices that were a prerequisite to foreclosing on the mortgages TMS serviced (the "Breach Letter Program").  See Exhibit 1 to the Declaration of Christina Nash (the "Nash Dec."), attached hereto as Exhibit A (Engagement Contract between TMS and Moss Codilis); Exhibit B (Excerpts of the Deposition of John Dunnery), at 549.  The contract was signed on behalf of Moss Codilis by Bill Breeden, who signed as the Operations Manager of Moss Codilis, a non-legal title.  Exhibit 1 to Nash Dec. at 4.  Mr. Breeden also signed an amendment to the contract effective January 10, 1998, as the "COO, Non-Legal Affairs".  Id., at 5.  Moss Codilis communicated to TMS that, given the nature of the Breach Letter Program, Mr. Breeden, a

non-lawyer, was the appropriate person to have the ultimate operational responsibility for the Breach Letter Program.

2. Pursuant to the Breach Letter Program, TMS referred their residential mortgage loans that were a certain number of days in default to Moss Codilis for preparation of a default notice. A default notice was a prerequisite under virtually all the residential mortgages prior to taking any action to enforce the lien rights conveyed under the mortgage. These services related to the Program included the creation and mailing of these default notices (the "Breach Letters"). Exhibit A, ¶ 2 (Declaration of Christina Nash).

3. TMS compensated Moss Codilis for these services by paying Moss Codilis a "pre-set charge" that was originally fifty dollars ($50.00) (and then, in the amendment, was decreased to thirty-five dollars ($35.00)) for each Breach Letter. Moss Codilis did not receive any compensation from TMS in addition to the pre-set charge for each Breach Letter generated. Exhibit A, ¶ 3. In some instances, TMS then passed the costs of Moss Codilis' services on to certain of the borrowers. Although some borrowers reimbursed TMS for these fees, Moss Codilis had a contractual right to, and did in fact, collect its fees from TMS regardless of whether TMS charged and/or collected those fees from its borrowers. Exhibit A, ¶ 3; Exhibit 1 to the Nash Dec. at 1.

4. The Breach Letters were comprised of a series of forms or templates, which were then populated with information unique to the particular borrower who was receiving the Breach Letter, including information such as name, property address, and financial information regarding the loan at issue. Part of Moss Codilis' role in the Breach Letter Program was to make sure that the template for the Breach Letters complied with all state and federal laws applicable to servicing the mortgages. Sometimes that involved different text for letters designated for certain states. The Breach Letter templates and form text was created by

Leo Stawiarski, who was at the time a partner of the Moss Codilis law firm and licensed to practice law in the State of Colorado, the site of Moss Codilis' only offices. Exhibit A, ¶ 4; Exhibit D (Colorado Attorney Information for Leo Stawiarski).

    5.  Another attorney employed by Moss Codilis, Christina Nash was primarily responsible for overseeing the day to day operations of the Breach Letter Program when it began in April 1997 until October 1999. However, any changes to the template or form text of the Breach Letters had to be, and were, approved by Mr. Stawiarski. During her work with the Breach Letter Program, Ms. Nash frequently met with Mr. Stawiarski regarding the Breach Letter Program. Mr. Stawiarski remained involved with the Breach Letter Program during the time Ms. Nash administered the Breach Letter Program. Exhibit A, ¶¶ 4-5.

    6.  Other than the initial creation of, and the subsequent modifications to, the template Breach Letters, the Breach Letter Program was an exercise in mass processing, using proprietary information technology created for Moss Codilis. Specifically, TMS would send information regarding defaulted mortgages to Moss Codilis, typically once per month and electronically, in batches that usually exceeded 1000 borrowers. TMS required that the Breach Letters to these borrowers be mailed within 24 hours. Exhibit A, ¶ 6; Exhibit 1 to the Nash Dec. at 1.

    7.  In July of 1999, Moss Codilis hired Valerie Bromley to assist Ms. Nash in the administration of the Breach Letter Program, and to ultimately take over the Breach Letter Program. Ms. Bromley took over administration of the Breach Letter Program at the end of October of 1999. By November 1999, Ms. Nash's involvement in the Breach Letter Program was extremely limited. At that point, Ms. Nash was no longer involved in the review of any

individual loan files or Breach Letters in any way. Exhibit A, ¶ 9; Exhibit C, at 43 (Deposition of Christina Nash[1]).

8.  Ms. Bromley became licensed to practice law in Colorado on October 28, 1999 and remained licensed in Colorado during her tenure at Moss Codilis which ended on June 29, 2001. Exhibit A, ¶ 9; Exhibit D (Colorado Attorney Information for Valerie Bromley).

9.  Ms. Nash and Ms. Bromley performed little, if any, legal analysis of each borrower's information or of the individual Breach Letters. Exhibit A, ¶ 6. Rather, their work involved reviewing certain computer-generated data elements in the information provided by TMS in batches of over 1,000 borrowers, to ensure that the accounts met certain measurable, pre-determined criteria, such as the dollar amount of the borrowers' delinquency amount. Whenever an account appeared to have incomplete data, it was referred by the TMS for review. Exhibit C, at 37-42.

10.  Moss Codilis communicated to TMS the process of the Breach Letter Program, the drafting of state-specific template letters, and the level of review afforded to the information provided by TMS about its delinquent borrowers. TMS approved of that process. TMS' in-house counsel, Samuel Shusterman, also approved the form of the template Breach Letters. Exhibit A, ¶ 6.

11.  From time-to-time, and pursuant to pre-determined criteria, information regarding a particular borrower was flagged by the Moss Codilis proprietary software. The criteria included factors such as incomplete names or addresses and the total amount past due. The criteria for creating such "flags" included, for example, factors such as the total amount past due as a percentage of the loan balance, missing contact information for the borrower, or other

---

[1]   A copy of Christina Nash's entire deposition transcript has been previously filed as Docket Number 90.

key loan information. Ms. Nash or Ms. Bromley performed a review of the flagged loans and, if there was a potential problem with the information, they would send it back to TMS for a resolution. They, on occasion, may have exercised some business judgment in determining whether a Breach Letter should be sent. Exhibit A, ¶ 7.

   12. From time-to-time, and in a very limited number of instances during the Breach Letter Program, it is possible that Ms. Nash and Ms. Bromley may have reviewed some of the loan documents at issue and exercised limited legal judgment regarding whether a Breach Letter should be sent to a particular borrower. Exhibit A, ¶ 8.

   13. When Moss Codilis sent a breach letter to a borrower, it was not a false threat of a litigation or foreclosure. Mortgage servicers, such as TMS, were typically under strict guidelines issued to TMS by the investors in the mortgages to pursue foreclosures against borrowers after their loans became a certain number of days delinquent. Exhibit A, ¶ 10.

   14. Moss Codilis sent a Breach Letter to Plaintiff Lori Jo Vincent ("Vincent") on or about March 22, 2000. Exhibit E (Breach Letter addressed to Vincent). At that time, Ms. Nash had only very limited involvement in the Breach Letter program. Exhibit A ¶ 9.

   15. The Breach Letter stated that Moss Codilis was "authorized . . . to contact [Vincent] regarding the status of [her] account." The Breach Letter also stated that TMS "intends to enforce the provision of the Note and Security Instrument." Exhibit E.

   16. Moss Codilis sent a Breach Letter to Plaintiffs Linda U. Garrido and John Garrido (the "Garridos") on or about October 8, 1997. Exhibit F (Breach Letter addressed to the Garridos).

   17. The Breach Letter stated that Moss Codilis was "authorized . . . to contact [the Garridos] regarding the status of [their] account." The Breach Letter also stated that TMS "intends to enforce the provision of the Note and Security Instrument." Exhibit F.

18. Moss Codilis sent a Breach Letter to Plaintiff Ruth Ann Gutierrez ("Gutierrez") on or about September 28, 2000 and an additional Breach Letter on or about October 30, 2000.  Group Exhibit G (Breach Letters addressed to Gutierrez).  At that time, Ms. Nash had only very limited involvement in the Breach Letter program.  Exhibit A ¶ 9.

19. The Breach Letters stated that Moss Codilis was "authorized . . . to contact [Gutierrez] regarding the status of [her] account."  The Breach Letters also stated that TMS "may seek any and all remedies provided for in the contract."  Exhibit G.

20. TMS never charged or collected any amounts from Gutierrez related or attributable to these Breach Letters.  Exhibit B, at 552-555; Exhibit H (Transaction History Reconciliation for Gutierrez).

21. Because of her financial troubles, Gutierrez filed for bankruptcy on February 5th, 2004.  Exhibit I (Excerpts of Deposition of Gutierrez[2] at 33).  Her petition for bankruptcy was filed under the penalty of perjury.  Exhibit I, at pp. 34-35; Exhibit J (Bankruptcy Petition of Gutierrez) at 2.  Gutierrez also declared under the penalty of perjury that her schedule of assets, which was filed along with her bankruptcy petition, "was true and correct to the best of her knowledge, information and belief."  Exhibit I, at p. 37; Exhibit J at 2.  The schedule of assets, however, did not include the claims that Gutierrez asserts in this case, notwithstanding the fact that this case was pending at the time of her February 5, 2004 bankruptcy filing.  Exhibit I, at pp. 35-36; Exhibit J at 7.

22. None of the Breach Letters sent to any Plaintiff stated that Moss Codilis would act as counsel in a foreclosure proceeding.  Exhibits E, F, and G.

---

[2] Plaintiff Ruth Ann Gutierrez is now known as Ruth Ann Alamillo and that is the name used in her deposition.

23. None of the Breach Letters sent to any Plaintiff stated that a Moss Codilis would collect attorney's fees from the Plaintiffs. Exhibits E, F, and G.

24. None of the Breach Letters sent to any Plaintiff stated that Moss Codilis attorney had reviewed their loan documents. Exhibits E, F, and G.

25. TMS has never requested that Moss Codilis refund any of the fees paid by TMS to Moss Codilis because of any issue relating to the alleged unauthorized practice of law by Moss Codilis. Exhibit A, ¶ 11.

26. Ms. Nash has no recollection of doing any legal review with respect to any of Plaintiffs' loans. Exhibit A, ¶ 8.

Dated: November 12, 2010

MOSS, CODILIS, STAWIARSKI, MORRIS, SCHNEIDER & PRIOR, LLP

By: /s/ David J. Chizewer
David J. Chizewer (ARDC 06206747)
Jon E. Klinghoffer (ARDC 06270082)
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
(312) 201-4000

Thomas P. Battistoni (TPB 8012)
SCHIFF HARDIN LLP
900 Third Avenue
23rd Floor
New York, New York  10022
(212) 753-5000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he caused a copy of **MOSS CODILIS' LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS** to be served via on November 12, 2010 upon the following:

>Paul S. Grobman
>Law Offices of Paul S. Grobman
>555 – Fifth Avenue
>17th Floor
>New York, New York  10017
>*Via the Court's ECF/electronic mailing system*
>
>Himanshu R. Sharma
>Suite 2002
>286 Madison Avenue
>New York, NY  10017
>*Via Federal Express*
>
>Kenneth F. McCallion
>McCallion & Associates LLP
>24 West 40th Street
>New York, New York  10018
>*Via the Court's ECF/electronic mailing system*
>
>W. Hans Kobelt
>Daniel A. Pollack
>McCarter & English, LLP
>27th Floor
>245 Park Avenue
>New York, New York  10167
>*Via the Court's ECF/electronic mailing system*

>/s/ David J. Chizewer
>David J. Chizewer